IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA PEREZ-GARCIA, | |
| Plaintiff, | |
| v. | Case No. 13 C 1357 |
| CLYDE PARK DISTRICT, *et al.*, | Judge Harry D. Leinenweber |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Before the Court are two separate Motions for Summary Judgment by Defendant Clyde Park District (the "Park District") [ECF No. 123], and Defendants Brian Dominick, Jose Rodriguez, Alex Rueda, Frank Szczech (incorrectly spelled as "Szchech"), Mark Nowak, Tony Martinucci, and Mark Kraft (the "Individual Defendants") [ECF No. 126]. Defendants have also submitted a combined Motion to Strike the affidavit of Plaintiff Laura Perez-Garcia ("Perez-Garcia") [ECF No. 160].

For the reasons stated herein, the Individual Defendants' Motion for Summary Judgment is granted in part and denied in part, the Park District's Motion for Summary Judgment is denied, and the Motion to Strike is denied as moot.

I. BACKGROUND

Before relating the factual background of this case, the Court must first address Defendants' Motion to Strike Perez-

Garcia's affidavit. Without citing a single contradictory statement, Defendants urge the Court to strike the entire affidavit because it is "repeatedly contrary to [Perez-Garcia's] established deposition testimony on numerous matters." (Defs.' Mot. to Strike, ECF No. 160, at 3 ¶ 10.)

The Seventh Circuit has "long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill. v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1168 (7th Cir. 1996). However, courts generally disfavor motions to strike. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 379 F.Supp.2d 968, 971 n.1 (N.D. Ill. 2005). Moreover, Local Rule 56.1 "includes its own enforcement provisions," making motions to strike factual materials "superfluous." *Id.*

Defendants have already taken advantage of the enforcement provisions in Rule 56.1 by responding to each one of Perez-Garcia's additional factual assertions. The Court has considered these objections and is capable of determining which facts are inadmissible or otherwise improper. Defendants' Motion to Strike is therefore denied as moot.

The following facts are undisputed unless otherwise noted. The Park District manages the park and recreation facilities in the Town of Cicero, on the outskirts of Chicago. The Park

District's Board of Commissioners (the "Board") approves all hiring and firing matters within the Park District and is comprised of five individuals — Jose Rodriguez ("Rodriguez"), who serves as President, Brian Dominick ("Dominick"), Mark Nowak ("Nowak"), Alex Rueda ("Rueda"), and Frank Szczech ("Szczech") (the "Board Members"). Tony Martinucci ("Martinucci") serves as Executive Director of the Park District, and Mark Kraft ("Kraft"), who reports to Martinucci, serves as Recreation Director.

Perez-Garcia began working as an administrative assistant for the Park District in 2000. Her job responsibilities included managing receipts for Park District credit card charges, paying credit card bills, and processing payroll and check requests, among other things. (Pl.'s Resp. to Martinucci's First Set of Interrogs., Defs.' Ex. N, ¶ 3.) Park District employees typically turned credit card receipts into the business office, where Perez-Garcia worked, and if they failed to do so, Perez-Garcia would remind them by phone or e-mail to submit them. (Punzo-Arias Dep., Defs.' Ex. O, at 37:19-39:16.)

Perez-Garcia states in her affidavit that she consistently had to ask Martinucci and Kraft for receipts for purchases made on Park District credit cards — a fact that they dispute. Perez-Garcia testified at deposition that in 2005 and 2006, she

also began to observe charges on Martinucci's Park District credit card that she believed were not work related. On three occasions, Perez-Garcia drafted and sent internal memoranda to department heads, including Kraft and Martinucci, reminding them to submit their receipts. (Perez-Garcia Dep. Vol. I, Defs.' Ex. P, at 33:16–34:8.)

Perez-Garcia states in her affidavit that in 2007 and 2008, and again in 2011 and 2012, she took her concerns about the credit card charges to Rodriguez. She also states that she spoke to Rodriguez about Martinucci's other improper billing activities and showed him copies of related invoices. According to Perez-Garcia, Martinucci submitted invoices for expenses related to his daughter's volleyball team and a basketball team that he coached, and he requested that the Park District pay umpires and referees for games that had never taken place. At deposition, Rodriguez denied having any such conversations with Perez-Garcia. (Rodriguez Dep., Defs.' Ex. E, at 36:22–37:11.) However, Rueda testified that Rodriguez told him that Perez-Garcia had spoken to him about Kraft and Martinucci's improper credit card use. (Rueda Dep., Defs.' Ex. T, at 65:9–19.) In April 2012, Perez-Garcia, Kraft, and Martinucci, along with Town President Larry Dominick and several other employees, held a meeting. At the meeting, Perez-Garcia stated that she had

shared her concerns about Kraft and Martinucci's credit card use with Rodriguez.

In her affidavit, Perez-Garcia states that Martinucci cut off communications with her after the April meeting. However, this statement conflicts with previous deposition testimony in which Perez-Garcia stated that she had received an email from Martinucci that May. (*See,* Perez-Garcia Dep. Vol. II, Defs.' Ex. Q, at 268:22–269:21.) Perez-Garcia also claims that Kraft and Martinucci began stripping away her job responsibilities. Perez-Garcia apparently lost certain duties related to payroll and staffing concession stands at soccer games. According to Martinucci, Perez-Garcia's concession stand duty was taken away because one staff member Perez-Garcia assigned had a "health issue" that should have precluded him from working. When Martinucci found out, he decided that "everything from here on out" in terms of concessions staffing would go through the recreation office. (Martinucci Dep., Defs.' Ex. R, at 58:21–62:1.)

Three relevant events took place in May 2012. First, Perez-Garcia began providing Park District documents to David Duran ("Duran"), a former Board member and family friend, "to show him some of the corruption" in the hope that "somebody would do something about it." (Perez-Garcia Dep. Vol. II, Defs.' Ex. Q, at 299:21–300:22.) The documents included copies

of invoices and checks. Sometime in the middle of 2012, Duran showed the documents to Rodriguez and Rueda, who suspected he had received them from Perez-Garcia. (Rueda Dep., Defs.' Ex. T, at 59:11-61:2; Rodriguez Dep., Defs.' Ex. E, at 42:20-51:1.) Rueda testified that the documents did not appear to show any impropriety. (Rueda Dep., Defs.' Ex. T, at 59:2-61:2.)

Second, Perez-Garcia took her concerns to the FBI. Although Perez-Garcia claims that Duran directed her to do so, Duran denies this, and Kraft, Martinucci, and Larry Dominick all testified that they did not know Perez-Garcia went to the FBI until after she filed this lawsuit.

Finally, that same month, two break-ins occurred at the Park District, prompting the Park District to change locks and install a security camera in the business office.

On September 14, 2012, the security camera was damaged. Security footage revealed a hand reaching up and tampering with the camera's wires. After reviewing the footage, the Board questioned Perez-Garcia and another Park District employee, Alfredo Cintron ("Cintron"). Cintron told the Board that he, Perez-Garcia, and Perez-Garcia's daughter Tanya were in the office when the camera was disabled. Though Perez-Garcia denied knowledge of the incident, and doubt remains as to whose hand can be seen in the video, Perez-Garcia was suspended with pay on October 22, 2012, the day after her meeting with the Board.

Several Board Members testified that they had never heard any negative feedback about Perez-Garcia prior to September 2012, and Kraft and Martinucci stated that they had no reason to criticize her performance before then. However, during her suspension, three instances of purported misconduct surfaced: (1) unauthorized purchases on the Park District's Sam's Club card, (2) false representations to the Illinois Municipal Retirement Fund ("IMRF"), and (3) a $6,000 overpayment to Tag's Tuckpointing ("Tag's"), a business owned by Perez-Garcia's husband.

Sometime after Perez-Garcia's suspension, Rodriguez learned that Perez-Garcia had used the Park District's Sam's Club card to make personal purchases. Although the parties dispute which items were purchased and how Rodriguez came to know this information, Perez-Garcia admits that she used the card to purchase personal items. However, she contends that employees were free to do so pursuant to Park District policy, as long as they provided reimbursement. Rodriguez, on the other hand, testified that personal purchases were not permitted, and Perez-Garcia was the only individual who used the Sam's Club card in this way.

Also during the suspension, Paul Nosek ("Nosek") — a Park District accountant who had taken over Perez-Garcia's role as IMRF agent — discovered that in 2006, Perez-Garcia falsely

reported to the IMRF that she had resigned. Perez-Garcia received a refund of almost $4,000 before reenrolling in the fund. (Nosek Dep., Defs.' Ex. G, at 35:16-42:7.) Finally, Rueda and Nosek testified that they discovered what appeared to be an overpayment of $6,000 to Tag's in relation to work done at Cicero Stadium.

According to the Board, these three issues, in combination with the camera incident, led to its decision to terminate Perez-Garcia. The day after gathering for a meeting, on November 26, 2015, the Board sent Perez-Garcia her termination letter. Exactly who knew what at the time of the meeting is disputed, but each Board Member was aware of at least one of the issues mentioned above, as well as the camera incident, at the time of the decision.

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party may meet its burden by showing "there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If the moving party satisfies its initial burden, the non-moving party must demonstrate with evidence "that a triable issue of fact remains on issues for which [it] bears the burden of proof." *Knight v. Wiseman,* 590 F.3d 458, 463–64 (7th Cir. 2009).

The judge's role at summary judgment is not to make credibility determinations or weigh the evidence. *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007). In determining whether a genuine issue of material fact exists, the Court construes all evidence in the light most favorable to the non-moving party. *Bellaver v. Quanex Corp.,* 200 F.3d 485, 491–92 (7th Cir. 2000).

### III.  ANALYSIS

#### A. Count I – First Amendment Retaliation

In Count I, Perez-Garcia alleges that the Park District, Board Members, Kraft, and Martinucci retaliated against her based on her speech — specifically, her efforts to expose the improper credit card and billing activity within the Park District. Perez-Garcia claims that, as a result of her speech, Kraft and Martinucci took certain job duties away from her and the Park District, through the Board, suspended and ultimately terminated her.

To establish a *prima facie* case of First Amendment retaliation pursuant to 42 U.S.C. § 1983, a plaintiff must

establish that: "(1) [her] speech was constitutionally protected, (2) [she] suffered a deprivation likely to deter speech, and (3) [her] speech was at least a motivating factor in the employer's action." *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012) (citation and internal quotation omitted). Here, Defendants challenge only the first and third factors.

### 1. Individual Liability Under § 1983

As a threshold matter, the Individual Defendants argue that they are improper parties to Count I because Perez-Garcia has not alleged that they were personally involved in the deprivation of her First Amendment rights. In her Second Amended Complaint, Perez-Garcia does not indicate whether she is suing the Individual Defendants in an individual or official capacity.

Where, as here, a plaintiff sues both a local government unit and the individuals comprising it in their official capacity under § 1983, the official capacity claim is equivalent to the claim against the entity, and should be dismissed. *See, e.g., Kiser v. Naperville Cmty. Unit,* 227 F.Supp.2d 954, 960–61 (N.D. Ill. 2002). However, there is no "rigid rule that a § 1983 plaintiff who fails to designate whether a defendant is being sued in her official or individual capacity shall be presumed to be bringing the action against the defendant in her official capacity." *Miller v. Smith,* 220 F.3d 491, 494 (7th

Cir. 2000) (citing *Hill v. Shelander,* 924 F.2d 1370, 1373 (7th Cir. 1991)).   Here, Perez-Garcia's inclusion of a claim for punitive damages in her prayer for relief — a remedy only available in an individual capacity suit — provides at least some indication that she intended to sue the Board Members, Kraft, and Martinucci in their individual capacities.  *See, id.*

To state an individual capacity claim under § 1983, Perez-Garcia must show that the Individual Defendants, acting under color of state law, were personally involved in the deprivation of her First Amendment rights.  *Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir. 2001).  Perez-Garcia has alleged that the Board Members, acting under color of state law, voted to suspend and terminate her based on her speech, and that Kraft and Martinucci, acting under color of state law, curtailed her work duties based on her speech.  Although Perez-Garcia does not allege that Kraft and Martinucci caused her termination, their alleged actions could plausibly deter free speech.  *See, Power v. Summers,* 226 F.3d 815, 820 (7th Cir. 2000).  The Court finds Perez-Garcia's allegations of personal involvement sufficient to support a claim for individual liability under § 1983.

### 2.  *Protected Speech*

To establish protected speech under the First Amendment, a public employee must show that (1) she made the speech as a private citizen, (2) the speech addressed a matter of public

concern, and (3) her interest in expressing the speech was "not outweighed by the state's interests . . . in promoting effective and efficient public service." *Swetlik v. Crawford,* 738 F.3d 818, 825–26 (7th Cir. 2013) (citation and internal quotations omitted). Four instances of Perez-Garcia's speech are relevant here: the internal memoranda, and the communications to Rodriguez, Duran, and the FBI.

While a private citizen's speech is protected under the First Amendment, "speech that owes its existence to a public employee's professional responsibilities," is not. *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006). To determine whether a plaintiff spoke as a private citizen, the question is whether she spoke *pursuant* to her official duties — not whether her speech *related* to those duties. *Diadenko v. Folino,* 890 F.Supp.2d 975, 988 (N.D. Ill. 2012), *aff'd,* 741 F.3d 751 (7th Cir. 2013). Employees who voice their concerns publicly, or outside the usual chain of command, tend to speak as private citizens rather than employees. *Id.*

The Court first turns to the internal memoranda, which were reminders to Park District department heads to provide receipts for purchases made on Park District credit cards. The Park District argues that Perez-Garcia drafted the memoranda "as an ordinary matter of internal operations" in the course of her job duties. (Park Dist. Mem., ECF No. 124, at 4.) It is undisputed

that Perez-Garcia's job responsibilities as an administrative assistant included managing receipts for credit card charges and reminding employees to turn them in. The Court therefore finds that in issuing the internal memoranda, Perez-Garcia was speaking pursuant to her job duties, not as a private citizen.

The Court next examines Perez-Garcia's communications to Rodriguez, Duran, and the FBI. Even if it was customary for Perez-Garcia to remind employees to turn in receipts, taking her concerns to the Board President, a former Board member, and federal law enforcement was not. The Court concludes that in taking her concerns up and outside of the usual chain of command, Perez-Garcia was speaking as a private citizen.

In determining whether an employee's speech implicates a matter of public concern, the Court must look to the content, form, and context of the speech. *Craig v. Rich Twp. High Sch. Dist. 227,* 736 F.3d 1110, 1115–16 (7th Cir. 2013) (citation and internal quotations omitted). In terms of content, it is well established that government waste is a matter of public concern. *Valentino v. Vill. of S. Chi. Heights,* 575 F.3d 664, 672 (7th Cir. 2009). However, purpose matters, and speech that vindicates only a personal interest does not implicate a matter of public concern. *Id.*

Several times during deposition, Perez-Garcia testified that her purpose in copying internal documents was to protect

herself. When asked why she prepared documents to share with the FBI, she stated that it was because she had been blamed for certain errors at the Park District and added that she had no other purpose but to protect herself. (Perez-Garcia Dep. Vol. I, Defs.' Ex. P, at 87:19–88:20.) However, when asked why she communicated with Duran, she indicated that her purpose was to "show him some of the corruption" in the hope that he might be able to do something about it. (Perez-Garcia Dep. Vol. II, Defs.' Ex. Q, at 299:21–301:6.) This leads the Court to conclude that Perez-Garcia's communications to Duran and Rodriguez were not driven entirely by self-interest and touched on a matter of public concern: the misuse of Park District funds.

Because Defendants do not argue that their efficiency interests outweighed Perez-Garcia's speech interests, the Court finds Perez-Garcia's speech to Duran and Rodriguez to be protected under the First Amendment.

### 3. *Causation*

As an initial matter, to establish causation, Perez-Garcia must provide some evidence that Defendants were aware of her communications to Rodriguez and Duran. *See, Stagman v. Ryan,* 176 F.3d 986, 999–1000 (7th Cir. 1999). The Court notes that even if Perez-Garcia's communications to the FBI were protected, there is no evidence in the record that any Defendant knew of

them.  Thus, Perez-Garcia's First Amendment claim rests on her speech to Rodriguez and Duran.  Here, there is sufficient evidence showing that Kraft, Martinucci, and Rueda knew that Perez-Garcia had spoken to Rodriguez, and that at least Rodriguez and Rueda suspected that Perez-Garcia had supplied documents to Duran.

At summary judgment, the burden of proof as to causation is split between the parties.  *Kidwell,* 679 F.3d at 965.  If a plaintiff can show that her speech was at least a "motivating factor" in her employer's action, the burden then shifts to the employer to show that the adverse action would have been taken regardless of the speech.  *Zellner v. Herrick,* 639 F.3d 371, 379 (7th Cir. 2011).  If the employer carries this burden, the burden shifts back to the plaintiff to establish that the defendant's proffered reasons were pretextual.  *Id.*  At summary judgment, this requires a plaintiff "to produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie."  *Id.*  "In the end, the plaintiff must demonstrate that, but for [her] protected speech, the employer would not have taken the adverse action."  *Kidwell,* 679 F.3d at 965.

A plaintiff may show causation through direct evidence or a "convincing mosaic" of circumstantial evidence.  *Hobgood v. Ill. Gaming Bd.,* 731 F.3d 635, 643-44 (7th Cir. 2013).

Circumstantial evidence may include suspicious timing, evidence that the employer offered a pretextual reason for the employment action, and ambiguous statements from which an inference of retaliatory intent may be drawn. *Id.*

### a. *Kraft and Martinucci*

Perez-Garcia contends that, as a result of her speech, Martinucci "froze" communications with her, restricted her from certain offices within the Park District, and put her under surveillance. Martinucci and Kraft also took away certain job responsibilities and contributed to Perez-Garcia's suspension.

Before addressing the issue of causation, the Court finds that there is insufficient evidence from which a jury could conclude that Martinucci "froze" communications with Perez-Garcia. Although Perez-Garcia states that she was "shunned" immediately after she shared her concerns about improper credit card use at the April meeting, she previously testified that Martinucci emailed her in May of 2012 and told her she wasn't doing anything wrong. (Perez-Garcia Dep. Vol. II, Defs.' Ex. Q, at 268:22–269:21.)  This is insufficient evidence of an adverse employment action, let alone one motivated by speech.

The other actions attributed to Kraft and Martinucci are problematic for different reasons.  Although Perez-Garcia states she "was put" under surveillance and "was restricted" from certain offices in the Park District, she does not attribute

these actions to Martinucci. Even if she had, she has not linked them to her speech. It is undisputed that the surveillance camera was installed in response to the break-in and that Martinucci restricted access to his office for the same reason. (Martinucci Dep., Defs.' Ex. R, at 64:14–65:7; 76:7–77:8.) Perez-Garcia has provided no evidence of pretext to counter Defendants' explanation.

That leaves Perez-Garcia's contention that Kraft and Martinucci began eliminating many of her job responsibilities. In her affidavit, Perez-Garcia states that Kraft and Martinucci took away her duty of coordinating soccer concessions shortly after the April meeting. Even if the timeline of these events made it possible to infer causation, Kraft and Martinucci have offered a reasonable explanation for this action — one of the concessions workers Perez-Garcia had assigned had a health issue that should have precluded him from working. Again, Perez-Garcia has provided no evidence that this explanation is a lie.

Perez-Garcia also states that Kraft and Martinucci took away her payroll duties. Although it is unclear what these duties entailed, or when this incident occurred, it appears to have taken place in August (*see,* Perez-Garcia Dep. Vol. I, Defs.' Ex. P, at 82:16–84:14), approximately four months after the April meeting. Apart from timing, which is too remote to support an inference of causation, Perez-Garcia has not

presented any evidence from which a jury might conclude that Kraft and Martinucci took away her payroll duties based on her speech.

Finally, Perez-Garcia has provided little, if any, evidence, from which a jury could infer that Kraft and Martinucci were responsible for the suspension decision. Although Kraft signed the suspension letter, it is dated October 22, 2012. Perez-Garcia has provided no reason to believe that this decision — made more than six months after Kraft and Martinucci learned that Perez-Garcia had spoken to Rodriguez — was speech related. Defendants have also provided evidence that the decision was based on the camera incident, and specifically, Cintron's testimony placing Perez-Garcia in the business office at the time it occurred.

The Court therefore finds that Kraft and Martinucci are entitled to summary judgment on Count I.

### b. The Board

Perez-Garcia maintains that the Board suspended her, and ultimately fired her, based on her speech. To establish that her speech was a motivating factor in the Board's decision to take these actions, Perez-Garcia has assembled various pieces of circumstantial evidence, including comments from Rodriguez and Rueda, and inconsistencies in the Board's reasons for the

termination. These "'bits and pieces' . . . must be put into context and considered as a whole." *Hobgood,* 731 F.3d at 644.

The Court first turns to what Perez-Garcia claims is her most damaging evidence. When asked whether Perez-Garcia's distribution of documents to Duran was a reason to terminate her, Rodriguez indicated that although it did not contribute to his own decision, it was nevertheless a reason to terminate her. (Rodriguez Dep., Defs.' Ex. E, at 115:22–116:6 ("I wouldn't have used it, but yes.")). When asked the same question, Rueda stated that Perez-Garcia's distribution of the documents to Duran was "absolutely" a reason to terminate her. (Rueda Dep., Ex. T, at 137:6–10.) Rueda only shared this conclusion with Rodriguez, and may have been more troubled by the distribution of internal documents rather than their contents. Nevertheless, viewed in the light most favorable to Perez-Garcia, these comments lend some support to an inference of retaliation.

Perez-Garcia next contends that Defendants' proffered reasons for her termination are pretextual. Although causation and pretext are often addressed separately under the burden-shifting framework for retaliation claims, evidence of pretext may provide circumstantial evidence of a retaliatory motive. *See, Hobgood,* 731 F.3d at 644; *Koehn v. Tobias,* 605 F. App'x 547, 552 (7th Cir. 2015).

According to Defendants, Perez-Garcia was initially suspended based on the camera incident, which triggered a follow-up investigation revealing other instances of misconduct, including unauthorized Sam's Club purchases, improper IMRF submissions, and unauthorized payments to Tag's. Although Perez-Garcia denies involvement in the camera incident, and questions remain as to whose hand can be seen tampering with the camera's wiring, it is undisputed that the camera was damaged and that the Board heard testimony from Cintron that Perez-Garcia was in the room at the time. The Board at least appears to have a basis in fact for Perez-Garcia's suspension.

However, a haze of disputed facts surrounds the Board's reasons for Perez-Garcia's termination. At one point, Rueda's testimony suggests that Defendants were looking for a reason to terminate her once she was suspended:

> I had suspicion that maybe there were other things that we didn't know about. What are the things, I didn't know. But at that point, I just felt it was appropriate to bring up the fact that, you know, she is not here now, so it's probably a good idea to take a look at any payables, any receivables, take a look at the functions she would perform every day.

(Rueda Dep., Defs.' Ex. T, at 124:2-17.)

Moreover, the Board's explanations for Perez-Garcia's termination are inconsistent. Brian Dominick testified that when the Board decided to terminate Perez-Garcia, "[w]e talked about everything that [*sic*] between the Sam's Club bill, the

IMRF, the overpayment, the camera." (Brian Dominick Dep., Defs.' Ex. D, at 93:15-19.) Rueda similarly indicated that the IMRF issue and Sam's Club purchases, along with the camera, contributed to the decision to terminate Perez-Garcia. (Rueda Dep., Defs.' Ex. T, at 135:21-136:13.) However, Rodriguez testified that he had no knowledge of the IMRF issue at the time of the termination decision. (Rodriguez Dep., Defs.' Ex. E, at 91:17-92:22). And Rodriguez and Nowak both indicated that they had no knowledge of the alleged overpayments to Tag's. (Rodriguez Dep., Defs.' Ex. E, at 106:18-107:7; Nowak Dep., Defs.' Ex. V, at 55:23-55:21).

The one issue that Rodriguez did know of and rely on — Perez-Garcia's purchases at Sam's Club — is foggy. Although Defendants contend that an internal audit revealed improper use of the Park District's Sam's Club account, Martinucci and Nosek denied performing such an investigation. Perez-Garcia also testified that personal use of the account is allowed provided that there is reimbursement, and that she only made purchases for her personal use when she had the Park District superintendent's permission. Finally, Perez-Garcia did not recall the purchases that Defendants asked about, or alternatively testified that the items in question were authorized work-related purchases. There are too many disputed

facts to conclude that the Sam's Club purchases were the cornerstone of the Board's decision to terminate Perez-Garcia.

The inconsistent reasons for Perez-Garcia's termination and comments about the distribution of documents to Duran — coupled with Perez-Garcia's otherwise steady work history at the Park District — provide sufficient circumstantial evidence from which a jury could conclude that speech was a motivating factor in the Board's decision.

Ordinarily, "evidence that would permit a jury reasonably to find that protected speech motivated adverse action would not . . . end the inquiry at summary judgment." *Koehn,* 605 F. App'x at 552. The defendant would come forward with non-pretextual reasons for its decision, which the plaintiff would them attempt to rebut. *Id.* Here, however, Perez-Garcia need not produce any further evidence of pretext. She has raised a factual dispute as to Defendants' real motivation for her termination. The Board Members' and Park District's Motions for Summary Judgment on Count I are therefore denied.

### B. Count II – Violation of the Illinois False Claims Act

In Count II, Perez-Garcia argues that the Park District violated the Illinois False Claims Act ("IFCA") when it harassed, suspended, and terminated her in retaliation for her efforts to stop IFCA violations. The IFCA creates a private right of action for any employee who is "discharged, demoted,

suspended, threatened, harassed, or in any other manner discriminated against . . . because of lawful acts done . . . in furtherance of an action under this Section or other efforts to stop one or more violations of this Act." 740 ILCS 175/4(g)(1). Because the IFCA is nearly identical to the federal False Claims Act ("FCA"), it is evaluated under the same standards. *See, U.S. ex rel. Batty v. Amerigroup Ill., Inc.,* 528 F.Supp.2d 861, 871 (N.D. Ill. 2007). To prevail on an IFCA claim, Perez-Garcia must show that (1) her actions were taken "in furtherance of" an IFCA enforcement action and are protected under the statute, (2) the Park District knew she was engaged in protected conduct, and (3) the Park District's actions were motivated, at least in part, by the protected conduct. *See, Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004).

To establish "protected activity," an employee need not have actual knowledge of the IFCA. *Id.* at 480. Instead, the relevant question is whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.* Although "protected activity" encompasses a broad range of actions, "simply making internal complaints or pointing out problems to supervisors is not sufficient." *Batty,* 528 F.Supp.2d at 877.

The Court has already found that Perez-Garcia sent the internal memoranda pursuant to her job duties, and Perez-Garcia has submitted no evidence that she sent these reminders out because she suspected fraud. And, as stated above, Perez-Garcia has not shown that any Defendant knew she contacted the FBI. Thus, the only potential bases for Perez-Garcia's IFCA claim are her communications to Rodriguez and Duran.

The Park District argues that even though an employee in Perez-Garcia's position might have believed that Kraft and Martinucci were misusing government funds, Perez-Garcia cannot withstand summary judgment because she has produced no evidence showing that she actually believed they were committing fraud on the government. However, the Park District's argument only focuses on the internal memoranda. In reporting her concerns to Board President Rodriguez, and collecting and providing documentation to Duran, it is reasonable to conclude that Perez-Garcia had a good-faith belief that fraud was occurring within the Park District.

The Court turns next to the issue of notice. In *Brandon,* the Seventh Circuit indicated that a plaintiff must establish that her actions put the defendant on notice of the "distinct possibility" of an FCA action. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.,* 277 F.3d 936, 944 (7th Cir. 2002). Again focusing on the internal memoranda, Defendants contend that

Perez-Garcia cannot show notice because she was acting pursuant to her job duties and driven by self-interest.

When fraud detection is part of an employee's job, a heightened notice requirement applies to so-called "fraud-alert" employees. *Fanslow,* 384 F.3d at 484. While it is true that Perez-Garcia's job involved managing receipts and reminding employees to submit them, she was not charged with investigatory duties, and was thus not a "fraud-alert" employee. As such, she need only show that the Park District was aware of her efforts to investigate credit card abuse and other alleged misspending. *See, id.* As discussed above, Rueda, Kraft, and Martinucci knew that Perez-Garcia had spoken to Rodriguez about improper credit card use and the potential misuse of funds, and Rodriguez and Rueda suspected that Perez-Garcia had supplied documents to Duran about this activity. From this, it is possible to infer that the Park District was aware that Perez-Garcia was looking into potential fraud.

Finally, the Court addresses the issue of causation. The "at least in part" standard closely resembles the "motivating factor" element in Perez-Garcia's First Amendment claim. *See, Haka v. Lincoln Cnty.,* 533 F.Supp.2d 895, 911 (W.D. Wis. 2008). Thus, for the same reasons discussed above — specifically Rueda and Rodriguez's comments and the inconsistent explanations for Perez-Garcia's termination — the Court finds that Perez-Garcia

has raised a triable issue of fact as to causation. The Park District's Motion for Summary Judgment on Count II is therefore denied.

## IV. CONCLUSION

For the reasons stated herein, the Individual Defendants' Motion for Summary Judgment [ECF No. 126] is granted as to Kraft and Martinucci and denied as to the Board Members. The Park District's Motion for Summary Judgment [ECF No. 123] is denied. The combined Motion to Strike [ECF No. 160] is denied as moot.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: October 5, 2015